**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | | |
|---|---|---|
| RICKY ALLAN GIROD II, | ) | CASE NO. 3:20-CV-01147-CEH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | CARMEN E. HENDERSON |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM    OPINION    &** |
| | ) | **ORDER** |
| Defendant, | ) | |
| | ) | |

## I. Introduction

Plaintiff, Ricky Allan Girod, II ("Girod" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 12). Because the ALJ followed proper procedures and her findings are supported by substantial evidence, the Court AFFIRMS the Commissioner's final decision denying to Girod SSI and DIB.

## II. Procedural History

On May 22, 2017, Claimant filed applications for DIB and SSI, alleging a disability onset date of December 7, 2015. The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 10, PageID #: 178). On October 12, 2018, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 10, PageID #: 92-128). On February 20, 2019, the ALJ issued a written decision finding Claimant was not disabled. (ECF

No. 10, PageID #: 68-92).   The ALJ's decision became final on March 31, 2020, when the Appeals Council declined further review.  (ECF No. 10, PageID #: 54).

On May 27, 2020, Claimant filed his Complaint to challenge the Commissioner's final decision.  (ECF No. 1).  The parties have completed briefing in this case. (ECF Nos. 12 and 16). Claimant asserts the following assignment of error:

> "ALJ Kerber Failed to Fully Consider Essential Vocational Expert Testimony Finding Mr. Girod to Have Functional Capacity to Perform Sedentary Work."

(ECF No. 12 at 3).

## III. Background

### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> The claimant, in the Adult Disability Report, alleges that he is unable to work due to his total left hip replacement, total right hip replacement, total right knee replacement, avascular necrosis (AVN) of the left knee, and lower back/pelvis pain from AYN/arthritis. (Exhibit 4E/2) The claimant, who was 30 years old at the time of the hearing, testified that he resides with his girlfriend and their two children ages 4 and 1. He testified that he has a high school diploma and became a certified carpenter in 2007 but never practiced in that trade.  He testified that he is presently employed at Walmart and has been employed there since September 2013. He testified that he had a knee replacement in January 2016 and tried to return to work full time, however, he began working part time in 2017 due to his back problems. He testified that he presently works three days a week with eight-hour shifts. He testified that he has had a bad attendance record at work and they allow him to take a break every two hours for 15 minutes. He further testified that since he started working three days per week he has not had to call off frequently but in the last year he has called off approximately 20 times. He also reported that he began seeking mental health treatment in 2017. He testified that he has hard time remembering dates and has to write things down due to his memory. He testified he was seeking treatment at Westwood Behavioral Health but later voluntarily stopped as he did not want to take the medication and was able to calm down on his own

using relaxation techniques. He testified that he has been diagnosed with avascular necrosis and has had bilateral hip replacements. He testified that he needs his left knee replaced but cannot be off work for four months again without pay. He testified his left knee feels like he is walking on bone and his pain is exacerbated with walking and when it rains. He testified that he also has a herniated disc in his back that he had surgery/injections for and was able to return to work the following week after having the injections. He testified that he takes Tramadol and Xanadine for pain every 4 to 6 hours without any reported side effects. He further testified that relaxing and elevating his feet helps to relieve his pain. Lastly, he testified that his girlfriend takes care of the kids and household chores. (see hearing testimony)

(ECF No. 10, PageID #: 75-76).

## B. Relevant Medical Evidence

The ALJ's description of the medical evidence is not in dispute. The ALJ summarized the

evidence as follows:

Treatment records from Christa Guggenbiller, PA-C, of Orthopaedic Institute of Ohio, indicate that the claimant had a history of leukemia for which he was treated with chemotherapy and steroid treatment for at least four years. Due to the steroid treatment, he developed avascular necrosis (AVN) in the bilateral hips and underwent total hip arthroplasties in approximately 2008. He was later advised that he was developing AVN in his knees and other joints throughout his body. (Exhibit lF/19-20)

In early November 2015, the claimant presented for an appointment with Lois Hoersten, RN and Gregory Seller, MD. The claimant reported that he was following up regarding his diagnosed anxiety. He reported that his mood was appropriate with Prozac, he was having increased pain in his knees, and his hip pain was well controlled with Tramadol. Upon examination, the claimant appeared to be alert, well appearing, and in no acute distress. He demonstrated a reduced range of motion in his knees. No diagnosis or course of treatment was noted at the completion of this visit. (Exhibit 2F/22-23)

Later that month, the claimant presented for an appointment with Christa Guggenbiller, PA-C, to address right knee pain that had recently worsened in October 2015. He reported that Ibuprofen, Advil, and Aleve have been of little help. Upon examination, the

3

claimant demonstrated tenderness at the proximal pole of the patellar tendon along with some tenderness to palpation along the lateral aspect of the knee. The claimant reported pain with ambulation, was observed walking with a limp, and had decreased quadriceps strength. Otherwise, he had a negative McMurray test, he was ligamentously stable, and had good hamstring strength. X-rays were completed of the claimant's right knee, which showed increased density of the medial femoral condyle and apparent flattening of the medial femoral condyle with a questionable osteochondral defect. The claimant was diagnosed with right knee pain and was prescribed Vistaril. An MRI of the right knee was ordered and he was to schedule a follow up appointment after the MRI. (Exhibit lF/19-20, 2F/35, 3F/14 and l0F/18)

An MRI of the right knee showed multiple bone infarcts involving the distal femur, proximal tibia, and patella, chondromalacia of the medial femoral condyle, joint effusion, and Baker's cyst. (Exhibit lF/16-17)

The following month, the claimant returned for a follow-up appointment with the Orthopaedic Institute of Ohio with Dr. Gary Schniegenberg to discuss his MRI results. Due to the deformity and collapse of his right knee shown by the MRI, the claimant was diagnosed with osteonecrosis, right femur, and was prescribed Tylenol #3 and Vistaril for pain. He was to consider having a total right knee replacement and was advised to secure a sit-down job in the meantime. (Exhibit lF/14)

In January 2016, the claimant returned for a follow up appointment with Christa Guggenbiller, PA-C.   It was noted that the claimant had tried to continue working but was not able to tolerate the pain well enough to continue working. He reported that standing causes sharp pain, and his knee pain was exacerbated by climbing steps, walking any distances, getting up and down off the toilet, showering, and by cold temperatures.  He reported that sitting resolves his pain as well as the prescribed Vistaril and Tylenol #3. It was recommended that the claimant proceed with the right total knee arthroplasty.  (Exhibit lF/9)

After being cleared for surgery by Dr. Seller, on January 14, 2016, the claimant underwent a total right knee replacement due to his osteoarthritis, secondary to AVN from leukemia, at Van Wert Hospital while under the care of Dr. Schniegenberg. (Exhibit lF/11-13 and 2F/20-21) Treatment notes indicate that he tolerated the procedure well, while hospitalized he was administered various pain medications, and on January 16, 2016 when his pain stablized

4

[sic] he was discharged with home prescriptions of Lovenox, Vistaril, and Norco. He was also referred to aggressive physical therapy on an outpatient basis, was to be weight-bearing, as tolerated, and was given a prescription for a walker.  (Exhibit 9F/28)

Post-operatively, x-ray imaging of the claimant's right knee showed the prosthesis was in excellent position, his staples were removed, and the wound appeared good.  It was noted that the claimant was continuing to ambulate with the assistance of a walker and was working with continuing therapy.  (Exhibit lF/7)

Six weeks following the surgery, treatment notes indicate that the claimant exhibited 130 degrees of motion in his right knee, the wound had a little hyperemia, and neurotic checks were good. X-ray imaging of the claimant's right knee showed that he had excellent position, good alignment, no fracture or dislocation, and good bone cement prosthesis interface. He was to engage in activities as tolerated, he was to use steroid cream, and he was to return in six weeks for additional x-ray imaging. (Exhibit lF/5)

In April 2016, the claimant presented for an appointment with Dr. Schniegenberg to evaluate his right knee, three months post total knee replacement. It was noted that the claimant was doing well and exhibited 135 degrees range of motion in his right knee although his quadriceps remained weak. X-ray imaging continued to show the prosthesis in excellent position and nice bone cement prosthesis interface with no fracture or dislocation. He was prescribed Tramadol and Vistaril, he was to add low weights and high repetition to build up his endurance, and he was to return for a follow up in 9 months. (Exhibit lF/3)

Physical therapy notes from Van Wert County Hospital indicate that the claimant participated in 18 sessions of physical therapy following his total right knee replacement. Treatment notes indicate that, initially, the claimant presented with 57 degrees of active range of motion in his right knee with 2-3/5 strength and, upon discharge, exhibited 5/5 strength and had 130 degrees of active range of motion in his right knee. In May 2016, the claimant was discharged from therapy by his physician as his physical therapy goals had been met. The claimant was to continue with a home exercise program. (Exhibit lF/1)

In May 2016, the claimant presented for an appointment with Dr. Seller due to knee pain and for a prescription of Tramadol. The claimant also indicated that he that he had hip and mild back pain.

He denied having any symptoms of anxiety or depression. Upon examination, the claimant exhibited some tenderness in his back and had reduced range of motion in his knees. No further orders or diagnoses were noted upon completion of this visit. (Exhibit 2F/l7-18)

In August 2016, the claimant presented for a follow up appointment with Dr. Seller regarding his anxiety. It was noted that the claimant did not report any new pains and there was no evidence of abuse/overuse/diversion. Upon examination, the claimant displayed some tenderness in his back and had reduced range of motion in his knees. He was diagnosed with AVN of hip, other chronic pain, and arthritis of the knee for which he was prescribed Atarax, Tramadol, Prozac, and Zanaflex. (Exhibit 2F/14-16) Thereafter, the claimant continue [sic] to treat with Dr. Seller every three months for medication refills for his pain and anxiety. (Exhibit 2F/8-12)

In May 2017, treatment notes from Dr. Seller indicate that the claimant had been off work as he had injured his back. Examination notes indicate that the claimant had exhibited some tenderness at L5-Sl facet left.  The claimant was diagnosed with other chronic pain, AVN of hips, and generalized anxiety disorder. He was prescribed Zanaflex, Tramadol, Atarax, Mobic and Prozac. He was to follow up in 3 months. (Exhibit 2F/6-7)

In June 2017, the claimant presented for an appointment with Danielle Westrick, MD, at Delphos Medical Associates, due to lower back pain and bilateral wrist pain. The claimant rated his back pain as moderate.  The claimant described his wrist pain as moderate. He reported the pain was worsened by movement and palpation. Upon examination, the claimant exhibited bony tenderness in his wrists and decreased range of motion and tenderness in his lumbar spine. X- rays of the claimant's lumbar spine and wrist were ordered.  (Exhibit 2F/3-4) An x-ray of the lumbar spine showed 6 lumbar type vertebra, slight lumbar levoscoliosis, slight lower lumbar dextro scoliosis, slight deformity along the anterior inferior aspect of the L6 vertebra, slight retrolisthesis of L6 upon Sl, mild spurring of L6 anteriorily [sic], and moderate disc space narrowing at the L6-Sl level. (Exhibit 2F/29, 3F/16, and l0F/23) An x-ray of his bilateral wrists showed a normal left and right hand. (Exhibit 2F/28, 3F/15 and l0F/22) The claimant was to continue taking Tramadol and Zanaflex as needed, was given a handout on back exercises, and was to consider using wrist splints. (Exhibit 7F/51)

6

He returned for an additional appointment with Dr. Westrick that month with reports that the prescribed Tramadol and Zanaflex were not helping. He reported his pain was moderate and was waxing and waning. He further endorsed symptoms of depression including sadness and hopelessness. He reported that he felt that his pain was contributing to his depression. The claimant was observed to have an anxious and depressed mood. (Exhibit 7F/58 and 63-64) He was diagnosed with chronic midline low back pain without sciatica and was referred to Dr. Frank Fumich with Orthopaedic Institute of Ohio for further treatment. As to his psychiatric symptoms, he was diagnosed with anxiety and moderate episode of recurrent major depressive disorder, his Prozac was increased from 20 mg to 40 mg daily, and was referred to psychiatry for further evaluation and treatment. (Exhibit 7F/61 and 65)

Later that month, the claimant presented at Westwood Behavioral Health Center and was evaluated by Molly Shepherd, LISW-S, for an assessment. The claimant reported that he was getting upset with his co-workers who accused him of not pulling his weight at work. He reported having built up anxiety, has tension headaches, and lack of energy. He indicated that he has not seen his mother since 2012, his father has been incarcerated since 2013, he speaks with his oldest sister frequently via telephone, and he has a close relationship with his girlfriend and his daughter. He further indicated that his girlfriend was currently pregnant with an anticipated due date in November 2016. He reported his interests as carpentry, building and fixing things, and playing guitar. The claimant reported that he was getting close to having suicidal ideations but was able to blow it off and has never made plans or attempted to harm himself. He reported that he first consumed alcohol to intoxication when he was 14 and he bought a lot of alcohol when he was 21, however, he hardly drinks now. He reported that he sometimes drinks beer to let loose and get perspective. Upon examination, the claimant was cooperative and appeared well groomed. He was observed to have a dreary mood and anxious affect. His insight and judgment were normal and his thought process and memory were intact. He was estimated to have average intelligence. The claimant was diagnosed with generalized anxiety disorder, unspecified disruptive, impulse-control, and conduct disorder, and alcohol disorder, mild. The claimant was recommend [sic] to attend therapy and to consider couples sessions later. (Exhibit 4F) Thereafter, the claimant began attending counseling sessions with this provider. (Exhibit llF/8-16)

[…]

7

In August 2017, the claimant returned for an appointment with Dr. Westrick. The claimant reported that he was treating at Westwood for counseling which was going well. He reported that he was feeling better with the increased Prozac dosage. He reported that he was excited about the birth of his son in October/November. Upon examination, the claimant was noted to have a normal mood, behavior and affect. He was to continue taking Atarax for his anxiety and depression, was to continue taking Mobic for his pain, and was to continue counseling at Westwood.  (Exhibit 7F/73-75)

Later that month, during a medicine management appointment with Dr. Westrick, the claimant reported that he needed medications and a back to work slip.  He reported that he had not seen Dr. Fumich as he had to pay an outstanding bill and that he did not receive enough Tramadol in his most recent refill. He reported that he did not want to return to pain management as it "was unnecessary." The claimant was provided a return to work slip for August 26, 2017, was given a seven-day prescription for Tramadol, and was to return in three months. (Exhibit 7F/83-84)

In September 2017, during a counseling session at Westwood Behavioral Health Center, the claimant reported that he had returned to work at Walmart two to three nights per week and felt pleased to have a paycheck coming in again. He further reported that he and his girlfriend were getting along better now since he started working and that he felt better about himself.  He reported that since he was feeling much better he was considering discontinuation of counseling services. (Exhibit  llF/7)

In November 2017, treatment notes from Westwood Behavioral Health Center indicate that the claimant wished to discontinue services as things were going well and he his anger was not an issue. (Exhibit 11F/5) At the date of discontinuation of services, it was noted that he had a stable affect, his mood was euthymic, he denied suicidal thoughts, his memory and thought process were intact, and his insight and judgment were good. (Id.)

In January 2018, the claimant presented to Delphos Medical Associates for an appointment with Dr.  Westrick.  He reported that he was continuing to have pain in his lower back and had not yet been evaluated by Dr. Fumich due to an outstanding medical bill. He reported that he had stopped taking Mobic was using Salonpas patches. He reported that the pain was primarily in his left lower back and was not radiating. Upon examination, he exhibited decreased range of motion in the lumbar spine with

tenderness, spasm, and left lower back muscle tightness. He was further noted to have a normal mood and affect. The claimant was prescribed Lidoderm patches and was to follow up in 3 months. (Exhibit 14F/12-13)

In May 2018, treatment notes from Dr. Westrick indicate that the claimant had returned to work and his back was sore as a result. He reported that he previously treated with pain management and they advised him that Tramadol was addictive and was not a good option for him, however, he reported that it was the only drug that had given him any relief. The claimant was recommended to start physical therapy for his back pain but he declined the same because he felt as if he did not need it. Dr. Westrick declined to prescribe any pain medications long term and provided him with a pain management referral. (Exhibit 14F/19-20)

In June 2018, the claimant presented for an appointment at the Orthopaedic Institute of Ohio with Steven Palte, PA-C, regarding lumbar pain. The claimant reported having constant lower thoracic and lumbar pain that radiates into his bilateral buttocks, lateral thighs, and bilateral groin. He reported that his symptoms started two months prior. He reported that standing, walking, leaning forward, bending forward, rising from sitting, changing positions, and driving aggravate his pain. While sitting, lying on his side, lying on his back and lying on his stomach help to relieve the pain. He reported that use of muscle relaxers, narcotic pain medication, heat, ice and back exercises have provided only mild relief. The claimant rated his pain an 8 on a scale of 10. Upon examination, the claimant was well groomed, alert and oriented, and had a normal mood. He was observed to walk with an antalgic gait without an assistive device and had full range of motion in his lumbar spine. He demonstrated tenderness in the lower thoracic and lumbar spine. Otherwise, he had 5/5 strength in the bilateral lower extremities, negative clonus, and negative straight leg raise. X-rays of his lumbar spine showed L5-Sl degenerative disc disease and some endplate irregularity to L5. The claimant was diagnosed with intervertebral disc degeneration, lumbar spine, and spinal stenosis, lumbar spine. He was to have an MRI of his lumbar spine and was to return for a follow up after the MRI was completed. (Exhibit 9F/7-8)

In July 2018, an MRI of the claimant's lumbar spine showed degenerative disc disease L5-Sl with broad posterior disc bulge, mild neural foraminal narrowing, and no spinal canal stenosis. (Exhibit 9F/24 and 12F/13-16)

In August 2018, the claimant presented to an appointment with Dr. Westrick for a follow up appointment regarding his lumbar pain. The claimant indicated that he felt the Tramadol was helping with the pain and he did not need to treat with pain management. Upon examination, the claimant exhibited tenderness and bony tenderness in the lumbar spine with normal range of motion and no spasms. The claimant was to follow up with Dr. St. Clair regarding his MRI results and was to continue taking Tramadol and Zanaflex as needed. (Exhibit 14F/5-6)

Later that month, the claimant presented for a follow up appointment with Selvon St. Clair, MD, to discuss his MRI results. After reviewing the MRI results and examining the claimant, Dr. St. Clair scheduled the claimant to have an epidural steroid injection at L5-Sl and was to return to the office on an as needed basis. (Exhibit 13F)

On August 6, 2018, the claimant underwent elective lumbar epidural injections while under the care of Dr. Rodney Faulkiner. (Exhibit l5F/3)

(ECF No. 10, PageID #: 76-81).

Additionally, Claimant underwent a consultative examination. The ALJ summarized the consultation as follows:

In July 2017, the claimant was evaluated by the psychiatric consultative examiner, Bryan Krabbe, Psy.D. During the examination, he described functional problems associated with his AVN including difficulty walking, standing, sitting, bending, and lifting objects. He reported his longest period of employment was his current job with Walmart for four years. He reported no difficulties staying focused and performing tasks in a timely manner. He did note problems managing stress at work and described instances where he would have to "go away and cry." The claimant indicated that he is withdrawn, sad, depressed, and having financial stressors. He further described having a poor quality mood, inability to feel pleasure, feelings of worthlessness, loss of energy, insomnia, decreased motivation, concentration problems, social withdrawal, and crying spells. He denied having current homicidal or suicidal ideations but described a history of suicidal ideation. As to his daily living activities, he reported that he rests, he helps care for his daughter, he watches television, he listens to music, and he cleans. Additionally, he is able to drive, perform daily hygiene, household chores, shop for groceries and

prepare basic meals albeit slowed by physical limitations. He reported having difficulty remembering appointments and to take his medication. Upon examination, the claimant appeared to have adequate energy and moved at an appropriate rate of speed. He was observed to have adequate grooming and hygiene. He displayed no loose associations, flight of ideas, or delusions during the exam. His mood was noted as sad and he displayed no autonomic or motoric indications of anxiety. During a memory recall task, he was able to recall 6 digits forward and 4 digits backward and was able to recall 2 out of 3 words after a brief delay. He was able to perform serial 7 subtraction for 6 iterations in 30 seconds with no errors and was able to performs serial 3 subtraction from 20 in 12 seconds with no errors. It was noted that scores of 15 seconds or less suggested adequate attention and concentration. Additionally, he had no difficulty calculating division and fractions. His general level of intelligence was estimated to fall within the average range. It was noted that he had adequate insight and his judgment appeared to be sufficient to make decisions affecting his future. The claimant was diagnosed with unspecified depressive disorder. (Exhibit 5F)

(ECF No. 10, PageID #: 79-80).

## C. Opinion Evidence[1]

### 1. State Agency Reviewing Physicians

The State doctor, Abraham Mikalov, MD, at the initial level, opined in the physical residual functional capacity that the claimant can occasionally lift/carry 10 pounds and can frequently lift/carry less than 10 pounds, can stand/walk 3 hours in an 8 hour shift with intermittent breaks every 30 minutes, can sit 6 hours in an 8 hour workday, can occasionally operate foot controls with his bilateral lower extremities, can occasionally climb ramps/stairs, can never climb ladders, ropes, or scaffolds, can occasionally balance, stoop, kneel and crouch, can never crawl, and should avoid even moderate exposure to hazards. (Exhibit 2A/9-l l) The undersigned finds the limitations set forth by Dr. Mikalov to be persuasive and, as such, they are accounted for in the residual functional capacity assessment because they are consistent with the objective findings from the treatment record, and they are

---

[1] Claimant does not challenge the ALJ's assessment of the opinion evidence. The Court, therefore, quotes from the ALJ's decision in the interest of judicial efficiency.

supported with explanation. (Exhibit lF/1, 11-13, 16-17, and 19-20, 9F/24, 9E, and l5F/3, and claimant's hearing testimony)

The State doctor, Gerald Klyop, MD, at the reconsideration level, opined in the physical residual functional capacity that the claimant can occasionally lift/carry 10 pounds and can frequently lift/carry less than 10 pounds, can stand/walk 2 hours in an 8 hours shift with intermittent breaks every 30 minutes, can sit 6 hours in an 8 hour workday, can occasionally operate foot controls with his bilateral lower extremities, can occasionally climb ramps/stairs, can never climb ladders, ropes, or scaffolds, can occasionally balance, stoop, kneel and crouch, can never crawl, and should avoid even moderate exposure to hazards. (Exhibit 4A/9-l l) The undersigned finds the limitations set forth by Dr. Klyop to be generally persuasive and, as such, they are accounted for in the residual functional capacity assessment because they are consistent with the objective findings from the treatment record, and they are supported with explanation. However, the undersigned finds the opinion of Dr. Mikalov to be more persuasive in further limiting the claimant to standing and walking 3 hours in an 8 hours [sic] shift with intermittent breaks every 30 minutes. This limitation is also consistent with other opinion evidence of record discussed below. (Exhibit lF/1, 11-13, 16-17, and 19-20, 9F/24, 9E, and l5F/3, and claimant's hearing testimony)

(ECF No. 10, PageID #: 82).

### 2. Krista Hoersten, CHT, OTR/L, and Kyle Scheidt, PT

In August 2017, the claimant was evaluated by Krista Hoersten, CHT, OTR/L, and Kyle Scheidt, PT, for a functional capacity evaluation. They opined that the claimant can perform work at the medium exertional level. It was noted that the claimant performed well with sustained sitting, standing, walking and core lifting. It was further noted that his biggest limitation was transferring to and from the floor, needed for kneeling and a modified crouching position. It was recommended that the claimant have the ability to change positions after sitting for 30 minutes, that he be able to use a handrail to climb stairs for safety and stability with no two handed carrying of items while negotiating stairs, use of ladder only with aide of hand railings, avoid any activities that involve crawling, use of knee pads or cushion when crawling, and modified positioning of long sitting while crouching as well as support to transition to and from the floor. The claimant can rarely kneel, crouch and reach at mid level of 44 inches, can occasionally perform an elevated reach at 66 inches, and can frequently sit 60

minutes and stand 20-30 minutes. He can frequently walk, can occasionally climb stairs and ladders, can occasionally squat, can rarely perform repetitive motion with his bilateral feet, and can never crawl. Lastly, it was noted that it is anticipated that the claimant will be able to adequately tolerate an 8 hour work day provided the work requirements do not exceed the amounts stated in the functional abilities report. (Exhibit 6F and 12F/2-12) The undersigned finds the opinions of Krista Hoerten, CHT, OTR/L and Kyle Scheidt, PT, somewhat persuasive. While the evidence and their assessment supports that the claimant may be able to perform work at the medium exertional level for a few hours, the longitudinal evidence of record supports that the claimant should be limited to the sedentary exertional level of work, as set forth in the above residual functional capacity, as he would be unable to sustain a medium exertional level of work activity for a full eight-hour workday. However, the ability to stand after 30 minutes of sitting has been accommodated in the residual functional capacity assessment (Exhibit lF/1, 11-13, 16-17, and 19-20, 9F/24, 9E, and l5F/3, and claimant's hearing testimony)

(ECF No. 10, PageID #: 82-83).

### 3. State Agency Reviewing Psychologists

The State agency psychiatric consultants opined that the claimant can perform simple routine 1-4 step tasks that are not fast paced or have unusual production demands. They further stated the claimant is limited to occasional and superficial interpersonal contact with public, and would do best with infrequent changes in routine. (Exhibit 2A/l l-13 and 4A/l l-13) The undersigned finds the limitations set forth by the State psychiatric consultants to be persuasive and they are accounted for by the adopted residual functional capacity because they are consistent with the nature, scope, or findings from the treatment record, and they are supported by the evidence of record. (Exhibit 9E, 4F, SF, and claimant's hearing testimony)

(ECF No. 10, PageID #: 83).

### 4. Consultative Examination

Dr. Krabbe, the psychiatric consultative examiner, opined that the claimant performed adequately on a task to assess difficulty understanding, performed adequately on a task to assess short-term memory, and did not report any significant problems with learning work related tasks. The claimant has no difficulty maintaining

attention and focus and did not describe a history of problems with attention in concentration in school or within work environments. The claimant functions within adequate limits of intellectual functioning to understand and respond to supervisor feedback and adequately relate to co-workers. Lastly, the claimant displayed appropriate responses and affect during the examination when discussing past and current pressures, however, he described symptoms of depression that may compromise his ability to respond to work pressures leading to increased emotional instability and withdrawal. (Exhibit 5F) The limitations suggested Dr. Krabbe are persuasive and are accounted for by the adopted residual functional capacity because they are consistent with the nature, scope, or findings from the treatment record, and they are supported by the evidence of record. (Exhibit 9E, 4F, and claimant's hearing testimony)

(ECF No. 10, PageID #: 83).

### 5. Claimant's Sister – Naya Girod

The claimant's sister, Naya Nicole Girod, completed a third party function report. (Exhibit l0E). The undersigned notes that the claimant's sister is not a medical professional. As a lay witness, she is not qualified to make a diagnosis or argue the severity of the claimant's symptoms in relationship to his ability to work. The undersigned finds the opinion of Naya Girod, a layperson, less persuasive in comparison to the opinions of medical professionals as relied on herein.

(ECF No. 10, PageID #: 83).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. The claimant has the following severe impairments: history of leukemia; avascular necrosis of the bilateral hips, status post bilateral hip replacement surgeries; status post right knee replacement; lumbar degenerative disc disease; unspecified depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: stand/walk a total of 3 hours

14

in an 8-hour workday for no more than 30 minutes at a time; occasional operation of foot controls; occasional climbing ramps/stairs; no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, and crouching; no crawling; only occasional exposure to hazards such as dangerous machinery and unprotected heights; capable of understanding, remembering, and carrying out simple tasks that are not fast paced meaning the pace of productivity is not dictated by an external source over which the individual has no control; occasional interaction with the public; and limited to a work routine that is repetitive from day to day with few and expected changes.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from December 7, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V. Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v.*

*Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B. Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

**C. Discussion**

Claimant raises one issue on appeal: that the ALJ erred by not fully considering the testimony of the vocational expert when finding that Claimant had the ability to perform sedentary exertional work.[2] (ECF No. 12 at 3).

### 1. Substantial evidence supports the ALJ's finding at step five.

Prior to determining that Claimant could not perform his past relevant work at step four, the ALJ determined Claimant's RFC. The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). Here, the ALJ determined Claimant's RFC as follows:

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: stand/walk a total of 3 hours in an 8-hour workday for no more than 30 minutes at a time; occasional operation of foot controls; occasional climbing ramps/stairs; no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, and crouching; no crawling; only occasional exposure to hazards such as dangerous machinery and unprotected heights; capable of understanding, remembering, and carrying out simple tasks that are not fast paced meaning the pace of productivity is not dictated by an external source over which the individual has no control; occasional interaction with the public; and limited to a work routine that is repetitive from day to day with few and expected changes.

(ECF No. 10, PageID #: 74-75). When supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r of Soc. Sec.,* 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to

---

[2] The Court notes that Claimant's issue begins with a false premise. The ALJ did not find that Claimant had the functional capacity to perform sedentary work. Instead, the ALJ found that Claimant had the functional capacity to perform sedentary work *with additional limitations*.

try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

Although Claimant frames his issue as a challenge to the Court's analysis of the vocational expert's testimony, his argument appears to challenge the RFC determination at step five. Claimant asserts that the RFC did not reflect additional hypotheticals posed by the ALJ to the vocational expert including the individual being off task for more than 10% of a workday and needing to be absent from the workplace more than one day per month. (ECF No. 12 at 4). Claimant does not assert an error in the ALJ's RFC determination at the proper point in the sequential analysis. The Commissioner does not have the burden to determine the RFC at step five. Rather, at step five the Commissioner has the burden of proof to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). "The step five analysis is meant to determine, given the severity of the impairments *already proven*, whether there are jobs in the economy which a claimant can perform." *Id.* (emphasis added). If a Claimant has not established limitations to be included in an RFC by step four, the burden does not shift to the Commissioner to prove an RFC – or its limitations – at step five.  *Id.* at 392. Thus, Claimant's attempt to shift the burden of proving the RFC onto the Commissioner at step five is improper.

Moreover, the Commissioner properly met his burden to determine that there is work available in the economy that the Claimant can perform at step five. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the Claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation marks and citation omitted). "This

substantial evidence may be in the form of vocational expert testimony in response to a hypothetical question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Baker v. Barnhart*, 182 F. App'x 497, 500 (6th Cir. 2006) (citations and internal quotation marks omitted). The Commissioner met this burden through the testimony of the vocational expert, who testified that work exists in the national economy that accommodates Claimant's RFC and vocational factors. Therefore, the ALJ found that Claimant is not disabled.

During the hearing, the ALJ posed the following hypothetical:

> For my first hypothetical, please assume an individual of the claimant's age, education, and vocational background with the ability to perform a full range of work at the sedentary exertional level except the individual can stand and walk a total of 3 hours in an 8- hour workday, but for no more than 30 minutes at a time. Occasional operation of foot controls; occasional climbing of ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, and crouching; no crawling; only occasional exposure to hazards such as dangerous machinery or unprotected heights.

> The individual is capable of understanding, remembering, and carrying out simple tasks that are not fast paced, meaning the pace of productivity is not dictated by an external source over which the individual has no control; only occasional interaction with the public. And the individual is limited to a work routine that is repetitive from day to day with few and expected changes.

(ECF No. 10, PageID #: 125-126). The vocational expert testified that such a person would not be able to perform Claimant's past relevant work as none of it was classified as sedentary, but that there are significant jobs in the national economy that such a person could perform. (ECF No. 10, PageID #: 126). The vocational expert then testified that more than a ten percent off task rate would rule out all jobs. (ECF No. 10, PageID #: 127). Additionally, the vocational expert testified that more than one absence a month would be work preclusive for the hypothetical

person. (ECF No. 10, PageID #: 127).

Claimant raises several arguments as evidence that the ALJ failed to properly consider additional limitations of off-task percentage and absenteeism in the RFC: i.e., his activities of daily living, absences from his previous employment, assertions of "immense pain", the need to elevate his feet, and the need to adjust positions. (ECF No. 12 at 5-7). However, the RFC is supported by substantial evidence.

The ALJ's limitation that Claimant could stand/walk for a total of three hours in an eight-hour workday with breaks every 30 minutes is supported by the opinion of Dr. Mikalov, whose opinion the ALJ found persuasive as it was "consistent with other opinion evidence of record discussed below. (Exhibit lF/1, 11-13, 16-17, and 19-20, 9F/24, 9E, and 15F/3, and claimant's hearing testimony)". The ALJ adopted the remainder of the physical limitations from the opinions of Drs. Mikalov and Klyop, whose opinions were identical but for the stand/walk limitation.[3] Claimant does not challenge the ALJ's analysis of the expert opinions. Thus, substantial evidence supports the RFC.

Additionally, no expert opined that Claimant would be off task more than 10% of the time or absent more than one day a month due to his impairments. Instead, Claimant relies on his own testimony and subjective complaints. After detailing the medical evidence, the ALJ stated that although "claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms[,] … the claimant's statements concerning the intensity,

---

[3] Although on reconsideration Dr. Klyop opined that Claimant could stand/walk for only two hours of an eight-hour workday, the ALJ explained that Dr. Mikalov's opinion was more consistent with the medical records and Claimant's own testimony. Krista Hoersten, CHT, OTR/L, and Kyle Scheidt, PT opined that Claimant was less limited and able to perform medium exertional level work for a full eight-hour workday. The ALJ disagreed and found that more limitations were necessary than opined both these two experts.

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (ECF No. 10, PageID #: 81). For example, in August 2018, Claimant indicated that Tramadol was helping with his pain and that he did not need to treat with pain management. (ECF No. 10, PageID #: 81). In May 2018, Claimant was recommended to start physical therapy, yet he declined because he felt he did not need it. (ECF No. 10, PageID #: 81). Further, Claimant's argument that based on his past attendance record he will be absent from any work due to his pain is speculative. First, his previous employment was not sedentary work. (ECF No. 10, PageID #: 125). Although he may have missed work due to pain in his maintenance job – classified as medium per the DOT but light as performed by Claimant (ECF No. 10, PageID #: 125), the RFC took his impairments into consideration and limited him to sedentary jobs with additional limitations. Second, Claimant stated on various occasions that sitting alleviated his pain. (ECF No. 10, Page ID #: 77, 81). Sedentary jobs compatible with the RFC finding would involve sitting for most of the workday. E.g., 20 C.F.R. § 404.1567(a); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996) (sedentary work generally involves sitting for six hours of an eight-hour workday).

Finally, Claimant suggests that the opinion of the consultative psychological examiner, Dr. Krabbe, supports his argument that his depression may compromise his ability to stay on task 90% of the workday. However, Dr. Krabbe did not make such an observation. Instead, Dr. Krabbe stated based on Claimant's subjective complaints that Claimant's depression may compromise his ability to respond to work pressures, lead to increased emotional instability and withdrawal, and that Claimant has had crying spells. (ECF No. 10, PageID #: 530, 533). The ALJ considered Dr. Krabbe's concerns and included mental limitations in the RFC by restricting Claimant to "simple tasks that are not fast paced meaning the pace of productivity is not dictated

by an external source over which the individual has no control" and "a work routine that is repetitive from day to day with few and expected changes." (ECF No. 10, PageID #: 75). Moreover, November 2017 treatment notes from Westwood Behavioral Health Center indicate that the Claimant discontinued therapy services as things were going well. (ECF No. 10, PageID #: 773).

Accordingly, substantial evidence supports the RFC. The ALJ expressly explained that RFC is supported by Claimant's medical history, his medication use, the effectiveness of his treatment, and his activities of daily living when determining his RFC. (ECF No. 10, PageID #:83). Claimant even acknowledges that the ALJ "disclosed in great detail" his diagnoses and impairments, which caused him immense pain. (ECF No. 12 at 5). The ALJ considered the entirety of the medical record, the opinion evidence, and the statements of the claimant at the hearing in reaching her RFC decision. (ECF No. 10, PageID #:83). Finally, the ALJ noted that "no greater or additional limitations are justified." (ECF No. 10, PageID #:84).

After weighing all the evidence, the ALJ determined that Claimant's limitations would not cause him to be off task more than 10% of the time nor absent from sedentary work with additional limitations more than one day per month. Since substantial evidence supports the RFC, the decision must stand even if the evidence could support an opposite conclusion. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *Her*, 203 F.3d at 389-390. Claimant's argument essentially asks this Court to reweigh the evidence, which it will not do. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) ("[t]he scope of our review is limited to an examination of the record only. We do not review the evidence de novo, make credibility determinations nor weigh the evidence.").

The hypothetical posed by the ALJ to the vocational expert properly included Claimant's

limitations that the ALJ found were supported by the record. Although the ALJ raised with the vocational expert additional limitations pertaining to off-task percentages and absences, the ALJ concluded that these limitations did not apply to Claimant, which was supported by substantial evidence and within his "zone of choice". *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020); *Casey v. Sec'y of H.H.S.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Salyer v. Comm'r of Soc. Sec.*, 574 F. App'x 595, 596 (6th Cir. 2014). The vocational expert testified that there were approximately 160,000 jobs nationwide available to someone with Claimant's vocational profile, including the restrictions the ALJ found supported by the record as a whole. (ECF No. 10, PageID #: 126).

Accordingly, the hypothetical question accurately portrayed Claimant's individual physical and mental impairments; thus, substantial evidence supports the ALJ's finding that work is available in the economy that the Claimant can perform. *Baker*, 182 F. App'x at 500.

## VI.    Conclusion

Because the ALJ followed proper procedures and his findings are supported by substantial evidence, the Court AFFIRMS the Commissioner's final decision denying Girod Supplemental Security Income and Disability Insurance Benefits

IT IS SO ORDERED.

DATED: September 16, 2021

　　　　　　　　　　　　　　　*s/Carmen E. Henderson*　　　　　　　
　　　　　　　　　　　　　　　Carmen E. Henderson
　　　　　　　　　　　　　　　United States Magistrate Judge